**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

DAVID TOREN,
  40 East 80th Street
  New York, NY 10075,

        *Plaintiff,*

    v.

FEDERAL REPUBLIC OF GERMANY,
  a foreign state; and


FEDERAL MINISTRY OF FINANCE FOR THE
FEDERAL REPUBLIC OF GERMANY,
a foreign state and an agency and instrumentality
of a foreign state,


FEDERAL MINISTRY FOR ECONOMIC
AFFAIRS AND ENERGY  FOR THE
FEDERAL REPUBLIC OF GERMANY
a foreign state and an agency and instrumentality
of a foreign state,


DEPARTMENT OF CULTURE AND MEDIA
OF THE CHANCELLORY OF THE REPUBLIC
OF GERMANY,
a foreign state and an agency and instrumentality
of a foreign state,

        *Defendants.*

Case No. _____

**COMPLAINT**

      Plaintiff David Toren alleges the following against Defendants the Federal Republic of

Germany, the Federal Ministry of Finance for the Federal Republic of Germany, the Federal

Ministry for Economic Affairs and Energy for the Federal Republic of Germany, and the

1

Department of Culture and Media of the Chancellory of the Republic of Germany (collectively "Defendant"):

## INTRODUCTION

1.      In August 1939, at the age of 14, Plaintiff David Toren boarded a train leaving Nazi Germany for Sweden as part of a "Kindertransport," a coordinated effort to save Jewish children from the Nazis.

2.      After he escaped, his parents were gassed to death in Auschwitz.  His great-uncle David Friedmann, a wealthy industrialist, was declared an enemy of the state and confined by the Gestapo before he died in 1942.  Mr. Friedmann's daughter Charlotte also was gassed to death in Auschwitz.

3.      Mr. Toren, a Kindertransport survivor, is a legal heir to Mr. Friedmann and his daughter.

4.      Taking advantage of the freedom and opportunity offered to him in the United States, Mr. Toren created a successful life for himself in the United States of America.  He graduated law school, and had a successful career as an intellectual property lawyer.  He married and has a loving family.

5.      In November 2013, with Mr. Toren approaching 90 years of age, German prosecutors disclosed to the public that they had recovered more than 1,000 artworks from the son of a noted Nazi art dealer, Hildebrand Gurlitt.  At a press conference, they displayed prominently the masterpiece oil painting "Two Riders on the Beach," by Max Liebermann.

6.      The display brought back old memories to Toren.  He had seen "Two Riders" before; it had been hanging on the wall of Mr. Friedmann's home.

7.     With this new find, Mr. Toren engaged in extensive research to establish the provenance of "Two Riders."

8.     On September 21, 2015, in a Polish archive not normally used to obtain art information, Mr. Toren's researchers discovered an inventory list that precisely identified items that had been looted by the Nazis from his great-uncle.  The inventory list consisted of 10 pages and enumerated 306 art objects, of which 54 were paintings.  (The art described by the inventory list will be referred to herein as the "Friedmann Collection.")  A copy of the inventory list, with a certified translation, is attached hereto as Exhibit A.

9.     His research also has unearthed documents confirming how Defendant first established a bailment over the Friedmann collection, and how it then was converted by Defendant when it was looted by the Nazis, with the Friedmann collection and its proceeds accruing to Defendant's benefit.

10.     While Mr. Toren has made a successful claim for Max Liebermann's "Two Riders on the Beach" painting which was returned to him by Defendant Department of Culture and Media in 2015, Mr. Toren never has made any other claim against Defendant for the Friedmann Collection that the Nazis looted from his great uncle, and, to the best of his knowledge, neither has anyone else.  He never has received any compensation from the German government for the looted Friedmann Collection, and, to the best of his knowledge, neither has anyone else.  He proceeded expeditiously in bringing this claim as soon as he could specifically identify the art that had been looted from his family.

11.     The documents discovered in the Polish archive also identified specific securities that the Nazis looted from Mr. Friedmann.

12.     As he approaches his 92nd birthday, he asks this Court to order Defendant to return the looted art and securities to him, or to enter judgment in his favor for the present value of the Friedmann Collection and the value of the securities at the time of the looting.

## II.     PARTIES

13.     Plaintiff David Toren was born in 1925 in Breslau, then a major city in Germany. He is a United States citizen and resides in New York City where he is a retired intellectual property lawyer.  He is a lawful heir of David Friedmann and his daughter Charlotte.   Mr. Toren brings this suit on behalf of all of Friedmann's lawful heirs.

14.     The district court "Amtsgericht", of Cologne, Germany, has issued a certificate of inheritance establishing that Plaintiff is an heir of David Friedmann.  Under German law, the certificate is a sufficient basis on which Mr. Toren may file a lawsuit seeking to recover assets belonging to Mr. Friedmann at his death.  A copy of the Certificate of Inheritance from the German court in Cologne, along with an apostille and a certified translation, is attached hereto as Exhibit B.

15.     The Federal Republic of Germany through its Department of Culture and Media, in returning "Two Riders" to Mr. Toren, concluded that Mr. Toren was a rightful heir to Mr. Friedmann.

16.     Defendant the Federal Republic of Germany is a foreign state as defined in 28 U.S.C. § 1603(a).  It is the legal successor to the so-called Third Reich, the German Republic under the Nazi regime of Adolf Hitler.

17.     Defendant the Federal Ministry of Finance of the Federal Republic of Germany ("Department of Finance") is a foreign state as defined in 28 U.S.C. § 1603(a), and also is an

agency or instrumentality of a foreign state as defined in 28 U.S.C. § 1603(a).  It is the legal successor to the German Department of Finance under the Nazi regime.

18.     Defendant the Federal Ministry for Economic Affairs and Energy for the Federal Republic of Germany ("Ministry of Economics") is a foreign state as defined in 28 U.S.C. § 1603(a), and also is an agency or instrumentality of a foreign state as defined in 28 U.S.C. § 1603(a).  It is the legal successor to the German Department of Economics under the Nazi regime.

19.     Defendant the Department of Culture and Media of the Chancellery of the Federal Republic of Germany ("Department of Culture") is a foreign state as defined in 28 U.S.C. § 1603(a), and also is an agency or instrumentality of a foreign state as defined in 28 U.S.C. § 1603(a).  It is the legal successor to the Reich Ministry of Public Enlightenment and Propaganda, and responsible for issues of restitution of art looted by the Nazis.

## III.     JURISDICTION AND VENUE

20.     Plaintiff seeks relief for the genocidal expropriation of property.  This Court has subject matter and personal jurisdiction over each of the Defendants pursuant to 28 U.S.C. § 1330.  None of the Defendants is entitled to immunity under 28 U.S.C. §§ 1605-1607 (the Foreign Sovereign Immunities Act ("FSIA")), and process will be served pursuant to 28 U.S.C. § 1608.

21.     More specifically, this case concerns rights in property taken by Defendant the Federal Republic of Germany's predecessor in interest as part of its genocidal looting of the Jewish people in violation of international law.  That property, or property exchanged for such property, is present in the United States in connection with numerous commercial activities carried on in the United States by the Federal Republic of Germany.

22.     These activities include the German Information Center in Washington D.C., which publishes electronic newsletters, engages in various outreach activities, prints publications, manages exchange programs and round table discussions, and generally promotes business and cultural exchanges between Defendant and the United States.

23.     Another commercial activity engaged in by Defendant the Federal Republic of Germany is the Goethe Institut, a cultural institution, which, among other things, funds German cultural and language programming.  The Goethe Institut is located in New York, Boston, Los Angeles, Chicago, San Francisco and Washington D.C., and operates a Goethe-Zentrum (Goethe Center), a modified version of the Goethe Institute, in Atlanta. These branches of the Goethe Institut offer German language courses that require U.S. citizens to pay tuition in order to learn German. The Goethe Institut also offers for sale German language examinations and certificates to U.S. citizens.

24.     The Federal Republic of Germany also funds the German National Tourist Board, a national marketing organization.

25.     Defendant the Federal Ministry of Finance also holds the property at issue in this case, or property exchanged for such property, in the United States, and is engaged in commercial activity in the United States.  Those activities include the sale and purchase of financial instruments, banking and other financial transactions.

26.     Defendant the Federal Ministry of Economics also holds the property at issue in this case, or property exchanged for such property, in the United States, and is engaged in commercial activity in the United States.   Those activities include the conduct of marketing and promotional activities on behalf of German companies in the United States.

27.     Those activities also include an internet portal called IXPOS, through which it conducts a market for the sale and purchase of products and services in the United States. It also publishes brochures and newspapers, and foreign trade and investment magazines.

28.     In addition, Defendant has engaged in an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States. The sale by Müller-Hofstede of "Basket Weavers," item 252 of the inventory list, to Hildebrand Gurlitt, was a commercial activity outside the United States, which had a direct negative effect in the United States. The direct negative effect, includes, among other things, that the absence of the painting in the apartment of Cornelius Gurlitt prevented the Augsburg prosecutor from confiscating the painting and thus prevented plaintiff from making a claim for the restitution of the painting.

29.     The sale of Müller Hofstede of "Two Riders" to Hildebrand Gurlitt was a commercial activity that had a direct positive effect in the United States. The direct positive effect includes, among other things, that the painting was present in the Munich apartment of Cornelius Gurlitt, and could thus be confiscated by the Augsburg prosecutor and plaintiff thus could make a successful claim for its restitution.

30.     Venue is proper in this District, as the Defendants are "a foreign state [and a] political subdivision thereof." 28 U.S.C. § 1391(f)(4).

## IV.     FACTS CONCERNING THE LOOTING OF THE FRIEDMANN COLLECTION.

### A.     The Nazis Gained Control Over the German State and Began the Process of Inflicting on Jews Conditions Designed to Lead to Their Destruction.

31.     Adolf Hitler was appointed Chancellor of Germany by President Hindenburg on January 30, 1933. Well before that appointment, Hitler had declared in speeches and in writing his intention to destroy the Jewish people. In his manifesto Mein Kampf, for example, he stated

that the Jews were a cancer on the German people that had to be eradicated, and he promised that

once in power he would do so.

33.     Immediately upon Hitler assuming the Chancellorship, the German state began

the process of imposing on Jews severe conditions of life ultimately designed to bring about their

physical destruction and annihilation.

33.     In January 1933, all Jewish civil servants were dismissed.  Next, propaganda

minister Josef Goebbels directed the dismissal of Jews working in the entertainment industry,

including actors, composers, conductors, orchestra members and film stars.

34.     In 1934, Jewish professionals were deprived of their livelihood.  All Jewish

lawyers were disbarred and all Jewish physicians lost their license to practice medicine except to

treat Jewish patients.  Accountants, architects, and engineers and other professionals lost their

licenses to practice their calling.   Even members of such non-professional occupations as

barbers and taxi drivers had their operating licenses withdrawn.

35.     In 1935, the so-called race laws were promulgated at the annual meeting of the

Nazi party in Nürnberg. These laws added a new word to the German language,

"Rassenschande," literally "Shaming of the Race."   No German woman below the age of 45 was

permitted to work for a Jewish business or in a Jewish family. Generally all sexual intercourse

between Jews and Germans was prohibited and violations of this law were severely punished.

**B.     The German State Began Its Genocidal Looting of Jewish Property.**

36.      November 9, 1938 marked Kristallnacht (Crystal Night or the Night of the

Broken Glass), a new phase in the persecution of German Jews.  Herschel Grynszpan, a young

Polish Jew, had traveled to Paris and entered the German embassy there, where he shot and

killed a minor diplomat, Ernst von Rath.

37.     The assassination offered Hitler an excuse to intensify his attacks against the Jews.  On Kristallnacht, all synagogues were burned down and all Jewish stores were smashed and looted.  The next morning, all Jewish men between the ages of 17 and 75 were arrested and temporarily interred in concentration camps.

38.     The German government under the Nazis blamed the Jews for the violence that had destroyed their own property on Kristallnacht.   It passed the Tax on the Jews of German Nationality (also known as Judenvermögensabgabe or JUVA tax) which ordered the Jews to pay in cash twenty percent (20%) of their total property to the Ministry of Finance.  The tax later was increased to twenty-five percent (25%).

39.     Many Jewish people were forced to sell off real estate and businesses, usually at fire sale prices, in order to raise the necessary cash.

40.     Plaintiff David Toren, recently bar mitzvahed, still was residing in Germany at the time.  He observed how his father was directed by the administration of the Jewish community to assist the Jews in figuring out how much money they had to pay.

41.     On November 12, 1938, three days after Kristallnacht, the Decree for the Elimination of Jews from German Economic Life was passed.  Its goal was to "exclude the Jews from the economic life of Germany," and it stipulated the immediate liquidation of businesses owned by Jews.  Regulations adopted pursuant to this legislation prohibited all economic activity of Jews except for certain services that could be rendered to Jews only.

42.     After Kristallnacht, German legislation barred Jews from all public schools and universities, as well as from cinemas, theaters, and sports facilities.  In many cities, Jews were forbidden to enter designated "Aryan" zones. The government required Jews to identify themselves in ways that would permanently separate them from the rest of the population.

**C.      Defendant Looted Mr. Friedmann's Art Collection.**

43.      Josef Goebbels, the propaganda minister, was entrusted with responsibility for the looting and sale of Jewish art by the Nazi leadership.   He identified Hildebrand Gurlitt as an art dealer who could sell Jewish art abroad.  Hildebrand Gurlitt was known throughout Europe as a knowledgeable and shrewd art dealer who had widespread connections with art dealers in other European countries and also the United States.  Gurlitt engaged in extensive sales of Jewish art abroad, with the proceeds of the sale going to the German government.

44.      The program of Nazi genocide was conducted with punctiliousness in the enactment of laws and regulations authorizing the genocide and in the carrying out of the genocide in accordance with the enacted laws and regulations.

45.      On April 26, 1938, Goebbels had ordered that Jews possessing more than 5,000 RM in assets register their property.  But while Jewish businesses were subject to expropriation in 1938, private property was not yet subject to expropriation.

46.      On December 5, 1939, Dr. Westram, a representative of the Nazi Ministry of Economics in Breslau, wrote a letter to Herr Funk, the Nazi Minister of Economics in Berlin, titled "Securing Jewish Holdings of Art."  A copy of that letter is attached as Exhibit C.  Mr. Friedmann still lived in Breslau at the time.

47.      The letter acknowledged that the Ministry of Economics lacked any authority over Mr. Friedmann's art, but admitted that the Ministry was ordering the art to be held, and sought additional authorization for holding the art.

48.      Dr. Westram's letter provides that:

> A number of Jews, who due to their formerly acquired wealth own not
> inconsiderable art treasures, mainly pictures, furniture, genuine carpets,
> fine pottery, silverware and ivory miniatures, are still residing in my
> district, especially in the city of Breslau. The Aryanization of non-Aryan

business operations, which I have been entrusted with, unfortunately does not give me the authority to secure these valuables in the interest of the Reich. . . . Still, in individual cases that I have become aware of, I have made an effort to prevent the move of particularly valuable pieces of art to foreign countries - under the disguise of relocation items - because other authorities did not take action in these cases. However, since there is a risk that, due to insufficient controls by one authority, the sale of valuable items of art or its export to other countries is carried out, I request being given an assignment according to which I will be authorized to secure such objects in individual cases.

49.     The letter then explains that the "following case gives me reason for my suggestion:  A local authority sent me a valuation of artwork of a Jew, Friedmann, Breslau, Ahornallee 27, which has been created by a member of the Reichsfachschaft für das Sachverständigenwesen [Association of the Reich for Expert Opinions]. The list ended with a total valuation of 10,785.00 RM.  On December 3, I then had the information in the list verified directly on location in the residence of the Jew by my responsible clerk together with an arts expert.  The result of the verification was that the value of the evaluated art objects might be 10 to 15 times greater than the calculated total."

50.      The letter then proceeds to list prominent artists in Friedmann's collection, including "French impressionists such as Courbet, Pissarro, Raffaëlli, [and] Rousseau," and identifies well-known landscape painters, such as Frits Thaulow, Adolf Oberländer, and Walter Leistikow.  *Id.*  The letter also mentions valuable porcelain, pottery, Persian rugs, and antique furniture.  *Id.*

51.     Westram's December 5 letter specifically identifies paintings by Max Liebermann, including "Two Riders" and a painting called "Basket Weavers."  None of the other artworks are described with any degree of specificity.

52.     The letter asks for "authoriz[ation] to secure such objects" "in the interest of the
Reich." *Id.* The letter ends by stating that the writer "forbade the Jewish owner to sell any of the
works of art, or to dispose of it otherwise without obtaining permission from the authorities." *Id.*

53.     Between 1939 and 1941, Mr. Friedmann's art collection apparently was
maintained at Mr. Friedmann's home at Ahornallee 27 under the control of the District President
of Breslau as agent for the Federal Nazi government.

54.     In 1941, the Nazi leadership directed Karl Hanke, district president of Breslau, to
obtain an inventory of David Friedmann's art collection.   A copy of that letter, and a certified
translation, is attached hereto as Exhibit D.  Hanke wrote to Mr. Friedmann and required that he
cooperate in the preparation of the inventory list and that he pay the fee of the art and antique
dealer.  He also warned Mr. Friedman not to sell or to dispose of any of his art objects.

55.     Mr. Hanke appointed a trustee who would supervise the matter, Georg Moch.
Hanke then issued a letter to Smendek,  an art and antique dealer in Breslau, owned by a Mr.
Schaffranietz, ordering the preparation of an inventory list of all the art objects in David
Friedmann's villa.

56.     Mr. Schaffranietz went to the villa and, going from room-to-room, catalogued in
detail all of Mr. Friedmann's art objects.  The inventory list required 10 pages and enumerated
306 art objects, of which 54 were paintings.  The inventory list included the identity of each
object, and in the case of the paintings, the name of the artist, the name of the painting, and its
dimensions.

57.     Two Max Liebermann paintings, "Two Riders on The Beach" and "Basket
Weavers" were on the inventory list as items 160 and 252 respectively.  At the end of the

inventory list, the preparer remarked that the total figure at which he had arrived, namely 60,793 RM, would be much higher after the end of the war.

58.     From 1939 to 1941, Germany had continued to enact legislation and adopt regulations persecuting Jews in support of the ultimate attempt at genocide, including a law depriving all Jews of citizenship and allowing for confiscation of their property under certain conditions.

59.     Nevertheless, various government institutions interpreted these laws and regulations to allow for confiscation of Jewish property only under one of two conditions.

60.     First, Jewish property could be confiscated if the Jewish person was on a deportation list. Once a Jewish person had been entered on a deportation list, he was advised by the Gestapo that he would be resettled in the east as soon as transportation by railroad was available. ("Resettling in the east" was a code expression used by the Nazis to disguise transportation to a death camp for extermination.)

61.     Since there was a shortage of railroad cars, the Jewish person was advised that it might take some time before a train would become available.  In the meantime, the Jewish person had to vacate his apartment or house on short notice and be moved to a one-room holding cell. These holding cells were frequently a room in an apartment, in which each room was occupied by a different Jewish person or family on the deportation list.

62.     Plaintiff's parents were confined in such a single room cell for almost seven months before they were transported on March 4, 1943 to the death camp Auschwitz. They were murdered the same day in a gas chamber.

63.     The other condition that triggered the confiscation of Jewish property was that the Jewish person had been put on a Reichsfluchtsteuerlist, or the "List for the tax fleeing the Reich," for those fortunate enough to find a means of escape.

64.     David Friedmann was apparently not on any deportation list or Reichsfluchtsteuerlist.  In view of this, the district president and the trustee decided not to confiscate the Friedmann Collection, but to turn the case over to the Gestapo.

65.     The Gestapo, the feared secret police of the third Reich, was classified by the post-war Nuremberg trial as a criminal organization.

66.     In order to confiscate Jewish property, the Gestapo frequently declared a Jew to be an "enemy of the state."

67.     Accordingly, in 1941, acting on its own behalf the Gestapo declared David Friedmann an enemy of the state.  A letter reflecting that action, with a certified translation, is attached hereto.  *See* Exhibit D.

68.     The art collection and all the contents of the living quarters in Ahornallee 27 were confiscated.  Mr. Friedmann, who was blind and 87 years old at the time, was evicted from the now empty living quarters of the villa and was confined to a single room in the servant's quarters.

69.     David Friedmann died a few months after having been confined by the Nazis, and was buried in the Jewish cemetery of Breslau.

70.     Plaintiff's parents attended the funeral.  Plaintiff visited David Friedmann's grave 25 years ago.

71.     The Gestapo, having confiscated the entire Friedmann Collection, decided to sell some or all of the paintings.  They appointed as their agent the director of the Silesian Museum for Fine Arts in Breslau, Cornelius Müller-Hofstede.

72.     Müller Hofstede then wrote to Hildebrandt Gurlitt, the art dealer who had been retained by Josef Goebbels.  In his letter, he suggests that Hildebrandt Gurlitt buy the two Max Liebermann paintings mentioned in the inventory list as item numbers 160 and 252.  A copy of that letter, with a certified translation, is attached hereto as Exhibit E.

73.     The evidence demonstrates that he did accept the offer.  The painting "Two Riders" was discovered in the collection of art horded by Cornelius Gurlitt, Hildebrand Gurlitt's reclusive son.  The painting "Basket Weavers" was sold by a German art auction house with a provenance that identified Hildebrand Gurlitt as a previous owner.

**D.      Plaintiff Acted Expeditiously upon Learning the Details of the Art That Had Been Looted from Mr. Friedmann.**

74.      Plaintiff at all times acted expeditiously in seeking the return of the artwork looted from Mr. Friedmann.

75.     Plaintiff left Germany for Sweden at the age of 14 on a Kindertransport in August 1939, a few days before the beginning of World War II.  As a 14-year old refugee in a foreign country, he lacked any interest in art and had no knowledge of the particulars of his great-uncle's collection, or what had become of it.

76.     Plaintiff learned however, after a press conference in Augsburg on November 5, 2013, that David Friedmann had a number of paintings other than "Two Riders on the Beach" by Max Liebermann.  He acted expeditiously on this information, hiring researchers and filing suit in order to have the artwork restituted to him.

**E.      The Looted Paintings Have a Current Value Well in Excess of $10 Million.**

77.      The paintings in the Friedmann collection have a current value well in excess of $10 million.

78.      "Two Riders" which was restituted to plaintiff as a result of a lawsuit brought by plaintiff against the Defendant, Federal Republic of Germany and the Free State of Bavaria, was sold at auction at Sotheby of London in June of 2015. The sales price was $2.5 million without the buyer's premium.  (Plaintiff does not seek relief for the looting of "Two Riders" because it has been returned to him.)

79.      French impressionist paintings as a rule have a higher market value than impressionist paintings painted by German painters, such as "Two Riders".  The market value of the four French impressionist paintings looted from Mr. Friedmann alone likely have a present market value far in excess of $10 million, and probably closer to $20 or $30 million.

**V.      FACTS CONCERNING SECURITIES LOOTED FROM MR. FRIEDMANN AND CHARLOTTE FRIEDMANN.**

80.      David Friedmann owned a substantial portfolio of securities that were handled by and stored with the Breslau bank Heimann, some of which were held in the name of his daughter Charlotte.

81.      German banks were under a legal obligation to notify the German Ministry of Finance periodically if they were carrying accounts owned by Jews.  Such a notification was required to state the amount of the account and its contents.

82.      When the Ministry of Finance learned that David Friedmann had been declared an enemy of the state, it notified the Heimann bank that the account of David Friedmann was being confiscated.

83.     The Finance Ministry ordered the Heimann bank to deliver all securities to the Silesian branch of the Ministry, which it did.  On November 21, 1942, the finance minister of lower Silesia wrote to the Minister of Finance in Berlin advising that Mr. Friedmann's property, including the securities, had been confiscated.  A copy of the letter, with a certified translation, is attached as Exhibit F.

84.     Plaintiff was unaware of the existence of these securities until recently, when his researchers uncovered a copy of the correspondence between the Heimann bank and the Ministry of Finance, which includes a listing of all the many securities owned by David Friedmann.  (The securities on this list are hereinafter referred to as the Friedmann Securities.)

85.     Plaintiff has attempted to settle this case with the German finance ministry and the Department of Culture and Media by writing to the heads of these departments setting forth the same facts as set forth in this complaint and requesting the return of the Friedmann collection or compensation therefore and compensation for the confiscated securities. Both letters remain unanswered.

**VI.     Causes of Action.**

### FIRST CAUSE OF ACTION
### (Conversion of the Friedmann Collection)

86.     Plaintiff David Toren incorporates the preceding paragraphs as if set forth fully herein.

87.     Plaintiff or his predecessor(s) in interest held a legal and possessory right or interest in the Friedmann Collection.

88.     Defendant established dominion over the property, or interference with it, in derogation of Plaintiff's rights.

89.     Plaintiff has been damaged by Defendant's conversion of the Friedmann Collection.

## SECOND CAUSE OF ACTION

### (Replevin of the Friedmann Collection)

90.      Plaintiff David Toren incorporates the preceding paragraphs as if set forth fully herein.

91.     Defendant has unjustly detained the artworks from the Friedmann Collection.

## THIRD CAUSE OF ACTION

### (Breach of Bailment Contract for the Friedmann Collection)

92.     Plaintiff David Toren incorporates the preceding paragraphs as if set forth fully herein.

93.     Defendants' order that Mr. Friedmann not sell or transfer his artworks created a bailment in which Defendants effectively took possession of the artworks with ownership continuing to remain with Mr. Friedmann.

94.     Defendants obtained only a custodial interest in the looted property at that time, rather than ultimate ownership rights.

95.     Defendants' possession of artworks from the Friedmann Collection constituted a bailment contract.

96.     Defendants breached their duty under the bailment contract to return the Friedmann Collection to its rightful owner.

97.     Toren has been damaged by the breach of bailment.

## FOURTH CAUSE OF ACTION

### (Accounting)

98.     Plaintiff David Toren incorporates the preceding paragraphs as if set forth fully herein.

99.     As a result of Defendants' actions, Defendants had, and continue to have, a fiduciary duty to return the artworks in the Friedmann Collection to Toren upon demand. Defendants have failed to fulfill that duty.

100.     Only Defendants know the whereabouts of all of the pieces of the Friedmann Collection that might currently be in their possession, custody, or control.  Defendants also are likely to have unique access to information concerning the disposition of the Friedmann Collection.

101.     Toren has no adequate remedy at law.

102.     Toren is entitled to an accounting of all artworks that are currently in Defendants' possession, custody, or control from the Friedmann Collection, and to all information concerning the Friedmann Collection that is currently in its possession, custody or control.

## FIFTH CAUSE OF ACTION

### (Conversion of the Friedmann Securities)

103.     Plaintiff David Toren incorporates the preceding paragraphs as if set forth fully herein.

104.     Plaintiff or his predecessor(s) in interest held a legal and possessory right or interest in the Friedmann Securities.

105.     Defendants established dominion over the property, or interference with it, in derogation of plaintiff's rights.

106.     Plaintiff has been damaged by Defendants' conversion of the Friedmann Securities.

## SIXTH CAUSE OF ACTION

### (Replevin of the Friedmann Securities)

107.      Plaintiff David Toren incorporates the preceding paragraphs as if set forth fully herein.

108.     Defendants have unjustly detained the Friedmann Securities.

## SEVENTH CAUSE OF ACTION

### (Accounting)

109.     Toren incorporates the preceding paragraphs as if set forth fully herein.

110.     As a result of Defendants' actions, Defendants have, and continue to have, a fiduciary duty to return the artworks in the Friedmann Securities to Toren upon demand. Defendants have failed to fulfill that duty.

111.     Only Defendants know whether the Friedmann Securities continue in existence, and whether they are currently in their possession, custody, or control.  Defendants also are likely to have unique access to information concerning the disposition of the Friedmann Securities.

112.     Plaintiff has no adequate remedy at law.

113.     Plaintiff is entitled to an accounting of the Friedmann Securities that are currently in Defendants' possession, custody, or control, and to all information concerning the Friedmann Collection that is currently in its possession, custody or control.

**WHEREFORE**, Plaintiff David Toren respectfully requests that the Court:

a.     Order Defendants to return to Toren all artworks in its possession from the Friedmann Collection;

b.      Order Defendants to account to Toren for artworks from the Friedmann Collection;

c.      Declare that Toren is a legal heir of the artworks from the Friedmann Collection;

d.      Award to Toren the value of any artwork in the Friedmann collection that is not returned to him;

e.      Order Defendants to return to Toren the Friedmann Securities;

f.      Order Defendants to account to Toren for the Friedmann Securities;

g.      Declare that Toren is a legal heir to the Friedmann Securities;

h.      Award to Toren the value of any of the Friedmann Securities that is not returned to him;

i.      Award pre- and post-judgment interest on any award; and

j.      Grant Toren such other and further relief as this Court deems just and proper.

Dated: September 20, 2016          Respectfully submitted,

*Martin Bienstock*
_____
**WEISBROD MATTEIS & COPLEY PLLC**
Martin Bienstock
August J. Matteis
1200 New Hampshire Avenue, NW, Suite 600
Washington, DC 20036
Tel: (202) 499-7900
Fax: (202) 478-1795
mbienstock@wmclaw.com
PToren@wmclaw.com

*Counsel for Plaintiff*